**NOT FOR PUBLICATION**

UNITED STATES DISTRICT COURT
DISTRICT OF NEW JERSEY

```
                                :
AMGRO, INC.,                    :   CIVIL ACTION NO. 06-472 (MLC)
                                :
        Plaintiff,              :   MEMORANDUM OPINION
                                :
        v.                      :
                                :
LINCOLN GENERAL INSURANCE       :
COMPANY,                        :
                                :
        Defendant/              :
        Third-party Plaintiff,  :
                                :
        v.                      :
                                :
RICHARD PISACANE, INC., et al., :
                                :
        Third-party Defendants. :
_____:
```

**COOPER, District Judge**

Plaintiff, AMGRO, Inc. ("AMGRO"), is an insurance premium finance company. (Dkt. entry no. 1, Compl., at ¶ 1.) AMGRO commenced this action against Lincoln General Insurance Company ("Lincoln General") on February 1, 2006 seeking, inter alia, "redress for Lincoln General's refusal to pay back the unearned portion of the insurance premiums collected [and allegedly misappropriated] by its authorized agent." (Id.) Thereafter, on August 23, 2006, Lincoln General filed a third-party complaint against Richard Pisacane ("Pisacane"), Northern Financial Group, Inc. ("Northern Financial"), Mark Grossbard ("Grossbard"), and Bancar Associates, Inc. d/b/a David MacGregor Company ("MacGregor") alleging (1) breach of contract, (2) fraud, (3)

civil conspiracy, (4) tortious interference with contract, and (5) unjust enrichment. (Dkt. entry no. 6, 3d Party Compl.) Also, on January 23, 2007, this Court entered an order consolidating Lincoln General Insurance Company v. Grossbard, Civil Action No. 06-3244 (PGS) ("Lincoln General Action") into this action. (Dkt. entry no. 18, 1-23-07 Ord.) There, Lincoln General alleges that its authorized agent, Northern Financial, and certain other insurance producers engaged in a "Premium Finance Scheme". (Id. at 1.)

AMGRO moves for summary judgment in its favor and against Lincoln General pursuant to Federal Rule of Civil Procedure ("Rule") 56. (Dkt. entry no. 27.) Grossbard and MacGregor separately move for summary judgment against Lincoln General pursuant to Rule 56 with respect to all claims asserted against them in the third-party complaint. (Dkt. entry no. 33.) The Court, for the reasons stated herein, will (1) grant AMGRO's motion, (2) grant Grossbard and MacGregor's separate motion with respect to the (a) civil conspiracy count, as it pertains to Grossbard, of the third-party complaint (b) tortious interference with contract count of the third-party complaint and (c) unjust enrichment count, as it pertains to Grossbard, of the third-party complaint, and (3) deny Grossbard and MacGregor's separate motion with respect to the unjust enrichment count, as it pertains to MacGregor, of the third-party complaint.

2

**BACKGROUND**

Lincoln General entered into an Agency Agreement with
Northern Financial, a wholesale insurance agent, on September 23,
2003.  (Dkt. entry no. 27-3, AMGRO' Stmt. of Mat. Facts ("AMGRO
Stmt. of Facts"), at ¶ 1; dkt. entry no. 29-4, Lincoln General's
Counter Stmt. of Mat. Facts ("Lincoln Gen. Stmt. of Facts"), at ¶
1.)  The agreement authorized Northern Financial to act as
Lincoln General's agent "for the purpose of soliciting, accepting
and binding commercial trucking insurance, and collecting
premiums for such insurance."  (AMGRO Stmt. of Facts, at ¶ 3; see
Lincoln Gen. Stmt. of Facts, at ¶ 3.)  Also, the agreement
required Northern Financial to inform Lincoln General about all
insurance binders it issued on Lincoln General's behalf and all
premium financing transactions entered into in connection with a
Lincoln General policy.  (AMGRO Stmt. of Facts, at ¶ 4; Lincoln
Gen. Stmt. of Facts, at ¶ 4.)

At the time Lincoln General and Northern Financial entered
into the Agency Agreement, Pisacane was the chief executive
officer of Northern Financial and a member of its board of
directors.  (AMGRO Stmt. of Facts, at ¶ 5; Lincoln Gen. Stmt. of
Facts, at ¶ 5.)  Pisacane, a lawyer, had been (1) disbarred for
knowingly misappropriating client trust funds, and (2) prohibited
from participating in the insurance business after pleading
guilty to charges of theft, forgery, and falsifying records in

3

1997 and 1998.  (AMGRO Stmt. of Facts, at ¶¶ 6-8; Lincoln Gen.
Stmt. of Facts, at ¶¶ 6-8.)  Lincoln General asserts that it was
not aware that Pisacane was disbarred or pled guilty to criminal
charges until after it entered into the Agency Agreement with
Northern Financial.  (Lincoln Gen. Stmt. of Facts, at ¶¶ 6-7,
10.)  Lincoln General also asserts that when it discovered that
Pisacane had been disbarred, it insisted that Northern Financial
end its relationship with him, and thus, Northern Financial
"confirmed that Pisacane resigned from his positions and divested
himself of all stock, and that new officers had been elected via
correspondence dated November 18, 2003."  (Id. at ¶ 6.)  AMGRO
argues, however, that Pisacane remained in control of Northern
Financial's operations.  (AMGRO Stmt. of Facts, at ¶ 14; see
Lincoln Gen. Stmt. of Facts, at ¶ 14 (noting that the extent of
Pisacane's continued involvement with Northern Financial is not
clear).)

     Northern Financial issued insurance binders binding Lincoln
General to issue insurance policies to the following trucking
companies, but did not initially inform Lincoln General that it
had done so: Qualified Transportation, CAS Delivery Service,
Runner Express, RLT Transport, Pluto Logistics, Paulie's Trucking
Corp., Carlos Serpa, Statewide Transportation, Fleet Transport,
KL Transport, Keith Industries, NJ Tubing & Reeling Co.,
Nationwide Warehouse, Solutions Freightline, RCS Trucking,

4

Complete Leasing Corp., Transcope Truck Sales, and Sun Transport ("Policyholders").  (See AMGRO Stmt. of Facts, at ¶ 19; Lincoln Gen. Stmt. of Facts, at ¶¶ 19-20.)  When Lincoln General later learned that Northern Financial had issued binders to each of the Policyholders, it issued the corresponding policies.  (Lincoln Gen. Stmt. of Facts, at ¶¶ 19-20.)  Lincoln General contends that Northern Financial issued the binders to the Policyholders without its knowledge as part of a fraudulent premium finance scheme.  (See id. at ¶ 20.)

MacGregor served as the retail insurance broker with respect to the policies issued to each of the Policyholders.  (AMGRO Stmt. of Facts, at ¶ 20; see dkt. entry no. 33-2, Grossbard & MacGregor's Stmt. of Undisp. Mat. Facts ("Grossbard & MacGregor Stmt. of Facts"), at ¶¶ 82-83 (noting that Northern Financial and MacGregor entered into a Producer Agreement that authorized MacGregor to procure Lincoln General polices on behalf of Northern Financial and retain a 10% commission on premiums generated by such policies).)  MacGregor is managed by Insurance World, Inc.  (Grossbard & MacGregor Stmt. of Facts, at ¶ 6.)  Grossbard is both the executive vice president of Insurance World, Inc. and MacGregor's risk management consultant.  (Id.)  After meeting with Pisacane and Northern Financial's chief operating officer, Insurance World, Inc., through Grossbard, loaned Northern Financial $30,000, guaranteed by Pisacane.  (Id.

at ¶¶ 69-77.)  One condition of the loan was that Northern
Financial would move into MacGregor's building and Insurance
World, Inc. would handle its books and underwriting.  (Id. at ¶
78.)  Although it accepted the loan proceeds, Northern Financial
did not move into MacGregor's building or permit Insurance World,
Inc. to handle its books and underwriting.  (Id. at ¶¶ 79-80.)
Further, neither Northern Financial nor Pisacane ever repaid the
loan.  (Id. at ¶ 81.)

    AMGRO asserts that it provided insurance premium financing
to each of the Policyholders.  (AMGRO Stmt. of Facts, at ¶ 22;
see Grossbard & MacGregor Stmt. of Facts, at ¶ 89 (noting that
the Lincoln General polices MacGregor procured on behalf of
Northern Financial were financed by AMGRO and First Funding
Insurance Co.).)  Specifically, it asserts that it paid the
policy premiums to MacGregor on behalf of the Policyholders, and
MacGregor then paid the premiums to Northern Financial, who
deposited the premiums into its bank account.  (AMGRO Stmt. of
Facts, at ¶¶ 24-26.)  However, pursuant to a Draft Authorization
Agreement between AMGRO and MacGregor, MacGregor was authorized
to issue AMGRO checks payable to MacGregor for financed premiums.
(Grossbard & MacGregor Stmt. of Facts, at ¶¶ 90-91.)  Further,
MacGregor could print a premium finance agreement from AMGRO's
website, which calculated all pertinent terms, and give the
agreement to the insured for execution.  (Id. at ¶¶ 92-93.)

6

MacGregor would fax a copy of the draft and the executed finance agreement to AMGRO, and then deposit the insured's down payment deposit and the draft for the financed amount into its trust account. (<u>Id.</u> at ¶¶ 94-96.) Thus, MacGregor often set up the premium financing for a particular insured on AMGRO's behalf.

All of the policies issued to the Policyholders were cancelled, before their expiration dates, for nonpayment of premium. (AMGRO Stmt. of Facts, at ¶ 27; Lincoln Gen. Stmt. of Facts, at ¶ 27.) Lincoln General contends that it did not receive any premium payments from Northern Financial with respect to the Policyholders, and thus, it did not refund any premium monies to Northern Financial for return to AMGRO upon cancellation of the corresponding policies. (Lincoln Gen. Stmt. of Facts, at ¶ 32.)[1] In fact, Lincoln General was not aware that Northern Financial issued binders to the Policyholders until it learned in January 2005 that Northern Financial had issued a binder to an insured named Stinger Transport but had not reported the binder to Lincoln General. (<u>See</u> Grossbard & MacGregor Stmt. of Facts, at ¶¶ 58-60 (explaining that Lincoln General first suspected that Northern Financial was misappropriating premiums

_____

[1] Lincoln General's "usual" procedure upon early cancellation of an insurance policy is to credit its agent for any unearned premiums so that such agent can return the premiums to the broker for forwarding to the appropriate insured or premium finance company. (<u>See</u> <u>id.</u> at ¶¶ 30-31; AMGRO Stmt. of Facts, at ¶¶ 30-31.)

when it learned about the binder issued to Stinger Transport in
January 2005).)   Nevertheless, "AMGRO has demanded payment from
Lincoln General of all unearned premiums on the cancelled
insurance covering the [P]olicyholders."   (AMGRO Stmt. of Facts,
at ¶ 33; see Lincoln Gen. Stmt. of Facts, at ¶ 33.)

**DISCUSSION**

**I.   Summary Judgment Standard**

Summary judgment is proper "if the pleadings, the discovery
and disclosure materials on file, and any affidavits show that
there is no genuine issue as to any material fact and that the
movant is entitled to judgment as a matter of law."   Fed.R.Civ.P.
56(c).   The movant bears the initial burden of showing that there
is no genuine issue of material fact.   Celotex Corp. v. Catrett,
477 U.S. 317, 323 (1986).   Once the movant has met this prima
facie burden, the non-movant must "set out specific facts showing
a genuine issue for trial."   Fed.R.Civ.P. 56(e)(2).   A non-movant
must present actual evidence that raises a genuine issue of
material fact and may not rely on mere allegations.   Anderson v.
Liberty Lobby, Inc., 477 U.S. 242, 249 (1986).

The Court must view the evidence in the light most favorable
to the non-movant when deciding a summary judgment motion.
Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574,
587 (1986).   At the summary judgment stage, the Court's role is
"not . . . to weigh the evidence and determine the truth of the

matter but to determine whether there is a genuine issue for trial." Anderson, 477 U.S. at 249.  Under this standard, the "mere existence of a scintilla of evidence in support of the [non-movant's] position will be insufficient [to defeat a Rule 56(c) motion]; there must be evidence on which the jury could reasonably find for the [non-movant]." Id. at 252.  "By its very terms, this standard provides that the mere existence of some alleged factual dispute between the parties will not defeat an otherwise properly supported motion for summary judgment; the requirement is that there be no genuine issue of material fact." Id. at 247-48 (emphasis in original).  A fact is material only if it might affect the action's outcome under governing law.  Id. at 248.  "[T]here is no issue for trial unless there is sufficient evidence favoring the nonmoving party for a jury to return a verdict for that party.  If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Id. at 249-50 (internal citations omitted).

## II. Summary Judgment Standard Applied Here

### A.   AMGRO's Claims Against Lincoln General

AMGRO argues that under New Jersey law, an insurer must return all unearned premiums upon cancellation of an insurance policy.  (AMGRO Br., at 18.)  AMGRO notes that (1) if a premium finance company paid the unearned premiums, then the insurer must return the premiums to the premium finance company for the

9

policyholder's account, and (2) the insurer is obligated to
ensure that the unearned premiums ultimately reach the insured
and this obligation does not cease when the insurer pays its
agent intending that such payments be transmitted to the insured.
(Id. at 19, 21.)   Further, AMGRO emphasizes that it paid the
Policyholders' premiums to MacGregor, and MacGregor then paid
them to Northern Financial, Lincoln General's authorized agent.
(Id. at 23.)   Thus, AMGRO asserts that (1) payment of the
premiums to Northern Financial constituted payment to Lincoln
General, (2) Lincoln General is not relieved of its obligation to
return the unearned premiums simply because it did not receive
such premiums from its authorized agent, and (3) Lincoln General
is not relieved of its obligation to ensure that the premiums are
returned to the insureds simply by crediting the unearned
premiums to Northern Financial's account.   (Id. at 23-25.)[2]
AMGRO also asserts that Lincoln General or its agent, Northern
Financial, had actual notice of the premium financing
arrangements with respect to the policies at issue.   (Id. at 27-

---

[2] The Lincoln General Action was transferred to this Court
from the United States District Court for the Middle District of
Pennsylvania ("M.D.Pa. Court").   Civil Action No. 06-3244 (PGS),
dkt. entry no. 1, M.D. Pa. Docket Sheet for Civ. Action No. 05-
1604, at dkt. entry no. 48.   Although they were each duly served
in the Lincoln General Action, neither Pisacane nor Northern
Financial answered or entered their appearance in that action.
See Civil Action No. 06-3244 (PGS).   Thus, the M.D.Pa. Court
entered default judgments against both Pisacane and Northern
Financial.   Id. at dkt. entry nos. 44, 45.

31.)  Thus, AMGRO contends that Lincoln General should both
return the unearned premiums to it, and pay a statutory penalty
for its failure to timely return the unearned premiums.  (Id. at
36, 39.)

Lincoln General asserts, in contrast, that New Jersey law
does not require it to return the unearned premiums under the
circumstances here.  Lincoln General notes that (1) one
applicable New Jersey statute requires an insurer to return
unearned premiums to an insured, not to a premium finance
company, and (2) a second applicable New Jersey statute requires
an insurer to return unearned premiums to a premium finance
company only if the insurer is on notice of the premium financing
agreement.  (Lincoln General Br., at 19-24.)[3]  Lincoln General
then argues that it did not have either actual or constructive
notice that AMGRO financed the premiums for the policies at issue
until after it mailed the cancellation notices for such policies.
(Id. at 25-30.)

Lincoln General also argues, inter alia, that AMGRO should
be estopped from arguing that Lincoln General is liable for the
bad acts of Northern Financial because (1) AMGRO had an agency
relationship with MacGregor, which also committed bad acts, (2)

_____

[3] To avoid confusion, Lincoln General's brief in opposition
to AMGRO's motion will be referred to as "Lincoln General Br.",
and Lincoln General's brief in opposition to Grossbard and
MacGregor's separate motion will be referred to as "2d Lincoln
General Br."

11

if AMGRO had notified Lincoln General that the policies at issue were financed when the financing contracts were executed, Lincoln General would have learned that Northern Financial was not forwarding premium amounts and acted to stop such fraudulent conduct, (3) genuine issues of material fact exist regarding whether Lincoln General (a) performed appropriate due diligence on Northern Financial before entering into the Agency Agreement and (b) acted negligently during the agency relationship, and thus, should be liable for Northern Financial's bad acts, and (4) AMGRO did not take necessary precautions to avoid suffering damages as a result of another party's bad acts.  (Id. at 31-38.) Accordingly, Lincoln General contends that AMGRO is not entitled to the unearned premiums or the statutory penalty.  (Id. at 39, 43 (noting that 5% statutory penalty applies only in situations where the premiums are paid directly by the insured).)  Further, Lincoln General emphasizes that AMGRO has not demanded that MacGregor return the 10% of the unearned premiums that it retained as commission, and notes that requiring it to return the full unearned premium amounts would unjustly enrich MacGregor. (Id. at 40-42.)

New Jersey law provides that when a financed insurance contract is cancelled:

> the insurer on notice of such financing shall return
> whatever gross unearned premiums are due under the
> insurance contract to the premium finance company for
> the account of the insured or insureds within a

> reasonable time, not to exceed 60 days after the
> effective date of cancellation, or 60 days after the
> completion of any payroll audit necessary to determine
> the amount of premium earned while the policy was in
> force.  Such audit shall be performed within 30 days
> after the effective date of cancellation.

N.J.S.A. § 17:16D-14(a).  The premium finance company must use

the returned unearned premiums to satisfy the outstanding account

balance of the insured, and then return any excess unearned

premiums to such insured.  N.J.S.A. § 17:16D-14(b).  If the

premium finance company fails to return any amounts due to the

insured within the applicable time period, the premium finance

company must pay a penalty to the insured "equal to 5% of the

amount due to the insured computed on a monthly basis for each

month or part thereof past the final date on which the refund was

due."  N.J.S.A. § 17:16D-14(c).

New Jersey law similarly provides that when an insurance

policy is cancelled:

> the insurer on notice thereof shall return to the
> insured, within a reasonable time not to exceed 60 days
> of cancellation or notice, whichever occurs last, or 60
> days after the completion of any payroll audit
> necessary to determine the amount of premium earned
> while the policy was in force, on a short rate basis
> the amount of gross unearned premiums paid . . . .  In
> the event the insurer fails to return the gross
> unearned premiums to the insured within the period
> provided for herein, the insurer shall, as a penalty .
> . ., return to the insured an additional amount equal
> to 5% of the gross unearned premium computed on a
> monthly basis for each month or part thereof past the
> final date on which the refund was due.

N.J.S.A. § 17:29C-4.1.  The Court agrees with Lincoln General

that this provision was intended to apply to situations where
insurance premiums were paid directly by the insured, whereas,
N.J.S.A. § 17:16D-14 applies when a premium finance company paid
the premiums.  (See Lincoln General Br., at 19-22 (reading
N.J.S.A. § 17:16D-14(a) in pari materia with N.J.S.A. § 17:29C-
4.1).)  Nevertheless, this provision, when read in conjunction
with N.J.S.A. § 17:16D-14, indicates that New Jersey law places
the obligation of returning unearned insurance premiums solely on
the insurer following a policy cancellation.  Moreover, financing
policy premiums does not alter the underlying relationship
between the insurer and insured.  Sheeran v. Sitren, 403 A.2d 53,
57 (N.J. Super. Ct. 1979).  Instead, "the premium finance company
steps in the shoes of the insured for all payments and setoffs
while leaving the insured-insurer relationship intact."  Id. at
58.  Thus, we conclude that N.J.S.A. § 17:29C-4.1 may apply to a
premium finance company acting on behalf of an insured.

The New Jersey Supreme Court, in Spilka v. South America
Managers, Inc., addressed the extent of an insurer's obligation
to return unearned premiums after a policy has been cancelled.
255 A.2d 755 (N.J. 1969).  There, the insurer entered into an
agency agreement with a licensed insurance agent pursuant to
which the insurance agent was authorized to bind certain types of
insurance on behalf of the insurer and cancel such insurance when
appropriate.  Id. at 757.  The insurance agent entered into a

14

"correspondents agreement" with a duly licensed broker in Atlanta, Georgia. Id. The insurance agent received a 30% commission from the insurer on all insurance policies procured, and it paid 20% of the 30% commission to the broker. Id.

The issues before the court arose when the insurer cancelled twenty-seven high risk motor vehicle damages insurance policies, which were issued through the insurance agent and broker, over a two-year period. Id. A portion of the premiums due under each of those policies was financed by the plaintiff, a premium finance company. Id. at 758. When the insurer cancelled the policies, it credited the insurance agent's account for the unearned policy premiums. Id. at 759. However, the insurance agent did not return the unearned premiums to the broker or the plaintiff. Id. Instead, the insurance agent set off the amount of the premiums against the amount the broker currently owed to it. Id. Thus, the plaintiff commenced an action against the insurer and the insurance agent seeking to recover the unearned premiums. Id. at 756. Following a trial, the superior court and later the appellate division each ruled in favor of the defendant insurer and insurance agent. Id. at 760.

On appeal, the New Jersey Supreme Court noted that the insurer and its agent had proper notice that the insureds assigned the returned premiums to plaintiff, and "there were no defenses available against the insured-assignors before notice of

15

the assignments". <u>Id.</u> at 761.  The court also noted that it was irrelevant that the broker had not remitted all the payments it received from the plaintiff to the insurance agent because "the broker was the agent of the insurer for the receipt of premiums, even though he was also the agent of the insured in procuring the insurance, and, thus, payment to him legally amounted to payment to the insurer." <u>Id.</u> (explaining that it would be grossly inequitable to require insureds to follow their premium payments and ensure they are actually received by the insurer).  The court then explained that an insurer is obligated to pay to an insured all unearned premiums following cancellation of a policy and:

> [t]hat obligation is not met where the insurer pays its agent, intending transmittal to the insured, if the money does not ultimately reach the insured.  If an insurer chooses to make such payment to someone other than the insured, it does so at its peril. Consequently it follows that an insurer's agent may not set off against unearned premiums.

<u>Id.</u>  Accordingly, the court entered judgment in favor of the plaintiff and against the insurer for the appropriate amount of the unearned premiums, plus interest from the date of the cancellation of each policy.  <u>Id.</u> at 761-62.

The facts of this case mirror <u>Spilka</u> in that a premium finance company paid policy premiums to a broker, MacGregor, that in turn paid such premiums to the insurer's agent, Northern Financial.  <u>See id.</u> at 757-58.  Thus, when the insurer cancelled the policies underlying those premium payments, the insurer was

16

obligated to return the unearned premiums, regardless of whether
it actually received all premium payments from its agent.  Id. at
761 (noting that payment of premiums to the broker amounts to
payment to the insurer, and then explaining that the insurer is
obligated to pay to the insured all unearned premiums following
cancellation of a policy); see N.J.S.A. § 17:22-6.2(a)
(authorizing a broker to receive insurance premium payments on
behalf of an insurer).  Therefore, Lincoln General has an
absolute obligation to ensure that the unearned premiums are
actually returned to the premium finance company or the insureds,
and cannot simply credit the account of its agent, Northern
Financial, with the expectation that it will then return the
premiums.  See Spilka, 255 A.2d at 761.

        N.J.S.A. § 17:16D-14(a) and N.J.S.A. § 17:29C-4.1, when read
together, place an unequivocal obligation on an insurer to return
unearned premiums on cancelled insurance policies to either the
insureds or the premium finance company.  See id.  Because the
Policyholders financed their premiums with AMGRO, N.J.S.A. §
17:16D-14(a) requires Lincoln General to return the gross
unearned premiums due under the insurance policies to AMGRO for
the account of the Policyholders.  Although N.J.S.A. § 17:16D-
14(a) requires only an insurer "on notice of such financing" to
return the unearned premiums to the premium finance company, this
provision does not contain any temporal limitation.  Accordingly,

17

it does not, as Lincoln General contends, condition return of the unearned premiums to the premium finance company on the insurer having actual or constructive notice of the financing arrangement before any specific date, such as the date the insurer sent its policy cancellation notices.  Instead, this language should simply be read as directing an insurer who is aware of a premium financing arrangement at the time it must return the premiums, to return such premiums to the premium finance company rather than the insured.  Thus, because Lincoln General was aware that the policies were financed by AMGRO at the time it should have returned the unearned premiums, it was required to return such premiums to AMGRO for the account of the Policyholders pursuant to N.J.S.A. § 17:16D-14(a).  (See Lincoln General Br., at 12 (acknowledging that once AMGRO learned it had sent notices of policy cancellation to the Policyholders, it forwarded numerous documents to Lincoln General, including "all of the notices of premium finance").)

Because Lincoln General failed to return the gross unearned premiums to AMGRO or the Policyholders, it must pay them "an additional amount equal to 5% of the gross unearned premium computed on a monthly basis for each month or part thereof past the final date on which the refund was due."  N.J.S.A. § 17:29C-4.1.  The interjection of a premium financier such as AMGRO does not alter the relationship between Lincoln General and the

18

Policyholders.  See Sheeran, 403 A.2d at 57.  In contrast, AMGRO stepped into the shoes of the Policyholders, and thus, it is entitled to assert all rights to payments and setoffs on their behalf, including the right to enforce the mandatory statutory penalty set forth in N.J.S.A. § 17:29C-4.1.  See id. at 58 (stating that "the premium finance company steps in the shoes of the insured for all payments and setoffs while leaving the insured-insurer relationship intact").  Moreover, N.J.S.A. § 17:16D-14(c) states that when an insurance policy is cancelled the premium finance company must pay a penalty if, after receiving the unearned premiums and applying them to the insured's outstanding account balance, it fails to return any excess funds to the insured "within the period designated".  Thus, reading N.J.S.A. § 17:29C-4.1 and N.J.S.A. § 17:16D-14(c) in pari materia suggests that a penalty must be imposed on the party responsible for preventing the timely return of unearned premiums to insureds.  Lincoln General's failure to remit the unearned premiums to AMGRO ultimately impeded AMGRO's ability to return any excess funds to the Policyholders.  Therefore, this Court finds that, in addition to returning the unearned premiums to AMGRO, Lincoln General must also pay the 5% penalty mandated by N.J.S.A. § 17:29C-4.1 to AMGRO, which has "stepped into the shoes" of the Policyholders.  Id. at 58.  For the above reasons, the Court will grant AMGRO's motion for summary judgment against Lincoln General.

**B.   Lincoln General's Claims Against Grossbard & MacGregor**

**1.   Conspiracy Claim Against Grossbard**

Lincoln General asserts that Grossbard and Pisacane (1) "started up" Northern Financial after Pisacane was released from prison, (2) perpetuated a premium finance scheme at MacGregor and Northern Financial, and (3) conspired to suppress information that would have alerted Lincoln General to the premium finance scheme.  (Dkt. entry no. 6, 3d Party Compl., at ¶¶ 56-60.) Lincoln General further asserts that the Producer Agreement between MacGregor/Insurance World, Inc. and Northern Financial served as the conduit for Grossbard's agreement with persons at Northern Financial to withhold premium payments from Lincoln General.  (2d Lincoln General Br., at 18.)  Lincoln General emphasizes that Grossbard made money "on both sides" of every transaction at issue here, permitted Insurance World, Inc. to loan money to Northern Financial, and served on Northern Financial's board of directors after Pisacane resigned.  (Id. at 18-19.)  Thus, Lincoln General argues that "[i]t belies common sense [for Grossbard] to claim that setting up the framework for this [premium finance] scheme to succeed did not 'assist' [Northern Financial] and Pisacane in their fraud."  (Id. at 19.) Lincoln General states that, at a minimum, material questions of fact remain unanswered by Grossbard.  (Id.)

Grossbard, in contrast, asserts that Lincoln General's conspiracy claim is based only upon a "suspicion" that Grossbard was involved in Northern Financial's alleged premium finance scheme. (Grossbard & MacGregor Br., at 30-31.) Grossbard further asserts that the record is devoid of any evidence that he had an agreement or confederation with Pisacane on the "essential scope and nature" of the premium finance scheme. (Id. at 31.) He notes that he did business with Northern Financial despite Pisacane's involvement with that company, not because of it. (Id. at 32.) Therefore, Grossbard contends that he is entitled to summary judgment on Lincoln General's conspiracy claim because "[t]here is simply no evidence from which an agreement between Grossbard and Pisacane to engage in a premium finance scheme could even be inferred." (Id. at 33.)

To state a civil conspiracy claim, a plaintiff must establish: "(1) a combination of two or more persons; (2) a real agreement or confederation with a common design; (3) the existence of an unlawful purpose; and (4) proof of special damages." Morganroth & Morganroth v. Norris, McLaughlin, & Marcus, P.C., 331 F.3d 406, 414 (3d Cir. 2003) (citation omitted). An agreement to commit a wrongful act does not, by itself, support a civil conspiracy claim. Id. Instead, at least one of the co-conspirators must commit a tortious act in furtherance of the conspiracy. Id. Accordingly, the "gist of

21

the claim, is not the unlawful agreement but the underlying wrong which absent the conspiracy, would give a right of action." Engineered Framing Sys., Inc. v. Vescom Structures, Inc., No. 05-1461, 2005 U.S. Dist. LEXIS 26295, at *15 (D.N.J. Nov. 1, 2005) (citation and internal quotations omitted).

Lincoln General has not set forth any evidence substantiating its civil conspiracy claim against Grossbard. Grossbard testified that, inter alia, he (1) had no professional interactions with Pisacane until 2001 or 2002 when an independent contractor, who worked for MacGregor, first brought Pisacane to MacGregor's offices, (2) did not deal with Pisacane except at the very beginning and very end of the relationship between MacGregor and Northern Financial, (3) did not give Northern Financial permission to appoint him as an agent or use his licenses, (4) was not going to "get involved" with loaning money to Northern Financial, but his interest in the company was "sparked" when Pisacane "brought McCavitt in who was supposedly from AIG and had all these reinsurance contracts and was able to get him all these companies", (5) was not aware that he had been elected to Northern Financial's board of directors and appointed an executive vice president until after commencement of this action, and (6) did not and would not have agreed to be elected to Northern Financial's board and appointed executive vice president.  (Dkt. entry no. 33-4, Cuomo Decl., Ex. C, 4-20-07

Grossbard Dep., at 35-37, 66, 75-76, 92-95.)  Thus, Grossbard's testimony suggests that his interactions with Pisacane were minimal and he did not consent to any direct involvement with Northern Financial, including appointment as its agent, officer, or board member.

Lincoln General has not offered any testimony or other evidence contradicting Grossbard's testimony.  See Morris v. Orman, No. 87-5149, 1989 U.S. Dist. LEXIS 1876, at *25-*26 (E.D. Pa. Mar. 1, 1989) ("[T]he burden is on the [non-movant], not the [C]ourt, to cull the record and affirmatively identify genuine, material factual issues sufficient to defeat a motion for summary judgment.")  Instead, Lincoln General essentially argues that Grossbard must have entered into an agreement or confederation with Pisacane because he permitted MacGregor to enter into a Producer Agreement with Northern Financial, benefitted from the transactions underlying this action, and set up the framework for Northern Financial's premium finance scheme.  (2d Lincoln General Br., at 18-19.)  Although a plaintiff may use circumstantial evidence to show an agreement between co-conspirators, unsupported inferences do not sufficiently establish the agreement necessary to support a conspiracy claim.  See Peters v. U.S. Dep't of Hous. & Urban Dev., No. 04-6057, 2006 U.S. Dist. LEXIS 4727, at *22 (D.N.J. Feb. 1, 2006).

23

Lincoln General has presented no facts that suggest to this Court that Grossbard and Pisacane had "one plan and that its essential scope and nature was known to each person." Id.  In fact, the record is devoid of any facts indicating that Grossbard and Pisacane communicated at all regarding any fraudulent purpose, much less developed a fraudulent scheme.  See id. at *23.  The Producer Agreement between MacGregor and Northern Financial suggests only a business relationship between those parties, and does not make any reference to the alleged premium finance scheme.  Further, neither Grossbard benefitting from the transactions underlying this action, nor his position as president of Insurance World, Inc., the company which established the inter-relationship between Northern Financial and Lincoln General, in any way infers that he was involved in Northern Financial's alleged premium finance scheme or ever facilitated such scheme through an agreement with Pisacane.  Thus, the Court will grant summary judgment in favor of Grossbard with respect to Lincoln General's conspiracy claim.

##### 2.   Tortious Interference with Contract Claim Against MacGregor[4]

Lincoln General alleges that MacGregor created the conditions necessary for Northern Financial to breach its contractual obligations to Lincoln General.  (Dkt. entry no. 6, 3d Party Compl., at ¶ 64.)  Specifically, Lincoln General asserts that MacGregor, <u>inter alia</u>, (1) misrepresented its status as an agent of Lincoln General to insureds and premium finance companies, (2) issued certificates of insurance and insurance cards to purported policyholders without authority to do so, (3) failed to report claims to Lincoln General, (4) facilitated the non-delivery of Lincoln General policies to insureds, and (5) failed to transmit premium payments it received from AMGRO to Lincoln General.  (<u>Id.</u>)  Lincoln General further alleges that MacGregor failed to follow up with Lincoln General and obtain policies after insurance binders had been issued for such policies, and issued phony and unauthorized temporary identification cards to insureds.  (2d Lincoln General Br., at

---

[4] The Court notes that in its brief in opposition to Grossbard and MacGregor's separate motion, Lincoln General states that both MacGregor and Grossbard are liable with respect to its tortious interference with contract claim.  (2d Lincoln General Br., at 20.)  However, Lincoln General's arguments then focus solely on MacGregor.  (<u>Id.</u> at 20-21).  Also, the third-party complaint indicates that the tortious interference with contract claim applies only to MacGregor.  (Dkt. entry no. 6, 3d Party Compl., at Count IV.)  Thus, this Court will assume that this claim is only asserted against MacGregor, and will not address Grossbard in this subsection.

2.)   Thus, Lincoln General contends that MacGregor (1) perpetuated Northern Financial's premium finance scheme, (2) interfered with its contractual right to timely obtain insurance binders and premium payments from Northern Financial, and (3) interfered with its reasonable expectation of economic advantage. (Id.)  Lincoln General contends that it is entitled to indemnification from MacGregor with respect to any damages this Court directs it to pay to AMGRO.  (Dkt. entry no. 6, 3d Party Compl., at Wherefore ¶ following ¶ 65.)

MacGregor, in contrast, asserts that Lincoln General's arguments in support of its tortious interference with contract claim make "no economic sense" because MacGregor could only benefit if the relationship between Northern Financial and Lincoln General remained intact.  (Grossbard & MacGregor Br., at 35-36.)  Accordingly, MacGregor would have no reason to interfere with the Agency Agreement between these two parties.  (Id.) Moreover, MacGregor alleges that Lincoln General's "laundry list of actions by MacGregor which purportedly constituted interference do[] not include any suggestion that MacGregor tried to dissuade [Northern Financial] from continuing its contract with [Lincoln General]."  (Id. at 36-37.)  Similarly, MacGregor notes that there is no evidence that it actually committed any of the allegedly interfering acts.  (Id.)  Thus, MacGregor contends that it is entitled to summary judgment on Lincoln General's

tortious interference with contract claim against it.  (Id. at 40-41.)

To state a tortious interference with contract claim, the plaintiff must show (1) intentional or malicious interference "with a prospective or existing economic or contractual relationship with a third party", (2) that the interference caused a loss of prospective gain, and (3) damages.  Angrisani v. Capital Access Network, Inc., 175 Fed.Appx. 554, 557 (3d Cir. 2006); see Cox v. Simon, 651 A.2d 476, 483 (N.J. App. Div. 1995) ("A plaintiff must prove actual interference with a contractual relationship, malice, and actual damages to succeed on a claim of intentional interference with a contractual relationship.").  A person acts with malice when he or she intentionally commits a wrongful act without a justification.  Cox, 651 A.2d at 483. Further, a tortious interference with contract claim cannot be directed at a person or entity that is a party to the contract. Emerson Radio Corp. v. Orion Sales, Inc., 253 F.3d 159, 173 (3d Cir. 2001).  Thus, "[a]n employee working for the corporation with which the plaintiff allegedly had a contract cannot serve as the third-party necessary for the tripartite relationship, unless the employee acted outside the scope of his employment." Silvestre v. Bell Atl. Corp., 973 F.Supp. 475, 486 (D.N.J. 1997).

MacGregor was not a party to the Agency Agreement between Lincoln General and Northern Financial.  See Emerson Radio Corp.,

27

253 F.3d at 173.  Although Lincoln General argues that Grossbard
was an officer of Northern Financial and thus a party to the
Agency Agreement, it has not made any analogous arguments with
respect to MacGregor.  Thus, Lincoln General may assert a
tortious interference with contract claim against MacGregor.  See
id.; Silvestre, 973 F.Supp. at 486.  However, Lincoln General has
not provided any evidence, circumstantial or otherwise,
suggesting that MacGregor, or one of its agents or employees,
interfered with the Agency Agreement between Northern Financial
and Lincoln General.  See Angrisani, 175 Fed.Appx. at 557.  In
fact, Lincoln General has offered no evidence establishing that a
MacGregor representative committed any act that impeded the
relationship between those entities.

    Even if MacGregor did, as Lincoln General asserts, fail to
"follow[] up to obtain allegedly bound policies" and "issue[]
phony and unauthorized temporary identification cards", such
conduct may constitute inappropriate or negligent business
practices but it in no way "interfered" with the contract between
Northern Financial and Lincoln General.  (See 2d Lincoln General
Br., at 20.)  Further, with respect to the allegedly interfering
conduct, Lincoln General has not established that MacGregor
engaged in any of the acts referenced with malice or intent.
Instead, Lincoln General's arguments in support of its tortious
interference with contract claim fail to discuss the element of

intent in any respect.  See Cox, 651 A.2d at 483 (stating that a plaintiff must prove, inter alia, that the defendant acted with malice to succeed on a claim of intentional interference with a contractual relationship).  Accordingly, even if a MacGregor employee or agent engaged in conduct that furthered or facilitated Northern Financial's alleged premium finance scheme, there is no evidence indicating that such person or entity committed such acts intending to disrupt without justification the relationship between Lincoln General and Northern Financial. See id. at 483.  Thus, the Court finds that summary judgment is appropriate on Lincoln General's tortious interference with contract claim against MacGregor.

### 3.  Unjust Enrichment Claim Against MacGregor and Grossbard

Lincoln General asserts that MacGregor and Grossbard have been unjustly enriched as a result of the premium finance scheme. (Dkt. entry no. 6, 3d Party Compl., at ¶ 67.)  Specifically, Lincoln General asserts that MacGregor and Grossbard, along with Northern Financial and Pisacane, "kept the premium payments received from the premium finance company, plaintiff AMGRO, for the policies identified . . . for themselves and did not forward or otherwise transmit those premium payments, minus their respective commissions, to [it]."  (Id.)  Thus, Lincoln General contends that this Court should, inter alia, direct MacGregor and Grossbard to disgorge all monies they received in connection with

29

the policies at issue, and indemnify it for all damages it is directed to pay to AMGRO.  (<u>Id.</u> at Wherefore ¶ after ¶ 68.)

Lincoln General states that there is no question that MacGregor has been unjustly enriched by the commissions it received in connection with the policies at issue.  (2d Lincoln General Br., at 13.)  Further, it states that MacGregor was enriched beyond its contractual rights with Northern Financial by knowingly failing to return the unearned commissions when no insurance policy was actually issued due to the premium finance scheme.  (<u>Id.</u>)  Accordingly, Lincoln General contends that because "MacGregor has been enriched by the continuation and perpetuation of this premium finance scheme and remains benefitting from its failure to return all unearned commissions, it is respectfully submitted the responsibility of MacGregor to Lincoln is obvious."  (<u>Id.</u> at 14.)

With respect to Grossbard, Lincoln General notes that (1) his name was included in Northern Financial's initial application with Lincoln General, (2) Northern Financial used many of his licenses to conduct its business, (3) he is listed as a Northern Financial officer in its reorganization documents, and (4) Lincoln General appointed him as an agent based on his involvement with Northern Financial.  (<u>Id.</u> at 14-15.)  It also emphasizes that Grossbard profited from the 10% commissions MacGregor improperly retained with respect to the policies at

issue, and received a share of the 5% commission Northern
Financial retained because he was Northern Financial's treasurer.
(Id. at 16.)  Based on these facts, Lincoln General argues that
the Court should infer that Grossbard participated in Northern
Financial's tortious conduct.  (Id. at 15.)  Therefore, Lincoln
General contends that Grossbard and MacGregor's motion for
summary judgment should be denied with respect to its unjust
enrichment claim.  (Id. at 17.)

    Grossbard and MacGregor assert, however, that MacGregor had
no contractual or quasi-contractual relationship with Lincoln
General; its relationship was with Northern Financial.
(Grossbard & MacGregor Br., at 26.)  Accordingly, Grossbard and
MacGregor assert that even if MacGregor is improperly retaining
unearned commissions, only Northern Financial has a claim against
MacGregor for return of such commissions.  (Id. at 26-27.)
Moreover, Grossbard and MacGregor argue that (1) Grossbard did
not hold any position at Northern Financial, and (2) even if
Grossbard was an officer of Northern Financial, he cannot be held
personally liable for the alleged premium finance scheme because
he did not participate in or direct that scheme.  (Id. at 27-29.)
Also, Grossbard and MacGregor note that Lincoln General cannot
assert an unjust enrichment claim against Grossbard in his
individual capacity because it did not have any contractual or
quasi-contractual relationship with him.  (Id. at 30.)  Thus,

31

Grossbard and MacGregor contend that they are entitled to summary judgment on Lincoln General's unjust enrichment claim insofar as such claim is asserted against them.  (Id.)

To establish an unjust enrichment claim, the plaintiff must show that (1) the "defendant received a benefit and . . . retention of the benefit without payment would be unjust", and (2) the plaintiff "expected remuneration from the defendant at the time it performed or conferred a benefit on defendant and that the failure of remuneration enriched defendant beyond its contractual rights."  Royale Luau Resort, LLC v. Kennedy Funding, Inc., No. 07-1342, 2008 U.S. Dist. LEXIS 11902, at *30 (D.N.J. Feb. 19, 2008) (quoting VRG Corp. v. GKN Realty Corp., 135 N.J. 539, 554 (1994)); Iliadis v. Wal-Mart Stores, Inc., 922 A.2d 710, 723 (N.J. 2007) (same); see Castro v. NYT Television, 851 A.2d 88, 98 (N.J. App. Div. 2004).  Liability may be imposed if facts were concealed from the plaintiff, but the plaintiff would have expected remuneration from the defendant at the time the benefit was conferred had he or she known the true facts.  Castro, 851 A.2d at 98.  Thus, a plaintiff may recover under an unjust enrichment cause of action if there was some direct relationship between the plaintiff and defendant that created a reasonable expectation of benefit, and the plaintiff expected remuneration. See id. at 98-99 (discussing prior holding).  However, a plaintiff cannot pursue a quasi-contractual claim for unjust

enrichment if there is an express contract covering the subject matter of the claim.  Royale Luau Resort, LLC, 2008 U.S. Dist. LEXIS 11902, at *30.

The subject matter of Lincoln General's unjust enrichment claim against MacGregor is not covered by any express contract between these parties.  See id.  Further, MacGregor does not dispute that it received a benefit, commissions, when it procured Lincoln General policies for the Policyholders.  See id. Specifically, MacGregor acknowledges that (1) it entered into a Producer Agreement with Northern Financial, which authorized MacGregor to procure Lincoln General polices on behalf of Northern Financial and retain a 10% commission on premiums generated by such policies, (2) it began procuring Lincoln General policies through Northern Financial in February of 2004, and (3) the policies it procured through Northern Financial were financed by AMGRO and First Funding Insurance Co.  (Grossbard & MacGregor Stmt. of Facts, at ¶¶ 82-84, 88.)

After discovering that Northern Financial had issued insurance binders for Lincoln General policies without informing Lincoln General that it had done so, Lincoln General notified MacGregor that it had cancelled several of its policies that MacGregor had procured through Northern Financial.  (Id. at ¶¶ 123, 135.)  In the normal course of business, Lincoln General would credit unearned premiums on cancelled polies to Northern

33

Financial, and Northern Financial would then provide the unearned premiums to MacGregor, which would return them to the premium finance company or insureds (after adding in its unearned commissions).  (<u>Id.</u> at ¶ 124.)  Northern Financial did not actually provide the unearned premiums to MacGregor, but instead, gave MacGregor credits that it could offset against amounts it owed to Northern Financial for unearned commissions.  (<u>Id.</u> at ¶¶ 125-126.)  MacGregor would then issue a check to AMGRO for the total amount of the unearned premiums (the amount credited by Northern Financial plus its unearned commissions).  (<u>See id.</u> at ¶¶ 127-134.)

Northern Financial, however, did not give MacGregor any credits with respect to some of the cancelled Lincoln General policies.  (<u>Id.</u> at ¶ 138.)[5]  Because Northern Financial did not credit MacGregor, MacGregor, in turn, did not credit its unearned commissions back to Northern Financial or return the total unearned premium amounts to AMGRO or the insureds.  (Grossbard & MacGregor Br., at 21.)  Regardless of whether Northern Financial credited MacGregor, permitting MacGregor to retain its unearned commissions on the remaining cancelled Lincoln General policies

---

[5] According to MacGregor and Grossbard, the total amount of unearned premiums on these cancelled Lincoln General policies is $140,182.83.  (<u>Id.</u> at ¶ 136.)  MacGregor's unearned commissions constitute $13,973.49 of this total amount, and Northern Financial has retained the remaining $126,209.34.  (<u>Id.</u> at ¶ 137-138.)  Lincoln General has not offered any evidence suggesting that MacGregor and Grossbard's numbers are incorrect.

34

would be unjust.  See Royale Luau Resort, LLC, 2008 U.S. Dist. LEXIS 11902, at *30.

Lincoln General, though its agent, Northern Financial, permitted MacGregor to serve as one of its retail insurance brokers, and directly solicit insurance policies to the general public.  (2d Lincoln General Br., at 5.)  MacGregor served as Lincoln General's retail insurance broker with respect to the policies issued to each of the Policyholders.  (AMGRO Stmt. of Facts, at ¶ 20.)  Thus, although there was no agreement or contract between Lincoln General and MacGregor, there was an indirect relationship between these parties that was established by Lincoln General's agent, Northern Financial.  (See id.)  See Castro, 851 A.2d at 98-99.  This relationship created a reasonable expectation of benefit, namely that MacGregor expected to receive a 10% commission on all premium monies it received for Lincoln General policies, and Lincoln General reasonably expected remuneration (i.e., that all of its retail insurance brokers would sell its insurance policies and remit all premium payments they received, and return unearned commissions following policy cancellation).  See Castro, 851 A.2d at 98-99.  It appears that MacGregor's retention of the unearned commissions on certain of the cancelled Lincoln General policies "enriched [MacGregor] beyond its contractual rights".  Royale Luau Resort, LLC, 2008 U.S. Dist. LEXIS 11902, at *30.  For this reason, the Court will

35

deny Grossbard and MacGregor's motion for summary judgment on
Lincoln General's unjust enrichment claim insofar as it is
asserted against MacGregor.[6]

The Court finds, however, that summary judgment is
appropriate on Lincoln General's unjust enrichment claim insofar
as it is asserted against Grossbard.  If Grossbard was, as
Lincoln General contends, an officer of Northern Financial,
Lincoln General's unjust enrichment claim against him must fail
because the Agency Agreement between Lincoln General and Northern
Financial would govern the relationship between the parties.  See
Suburban Transfer Serv. Inc. v. Beech Holdings, Inc., 716 F.2d
220, 226-27 (3d Cir. 1983) ("Quasi-contract liability will not be
imposed . . . if an express contract exists. . . .  The parties
are bound by their agreement, and there is no ground for implying
a promise as long as a valid unrescinded contract governs the
rights of the parties.); Royale Luau Resort, LLC, 2008 U.S. Dist.
LEXIS 11902, at *30 ("[W]here there is an express contract

_____

[6] This holding is limited in that it appears to us that
MacGregor must only return the $13,973.49 of unearned commissions
it has retained on the policies issued to the Policyholders.  We
do not find, however, that MacGregor must indemnify Lincoln
General for all damages Lincoln General must pay to AMGRO.  (See
dkt. entry no. 6, 3d Party Compl., at Wherefore ¶ after ¶ 68.)
We also note that Lincoln General has not cross-moved for summary
judgment, and thus, the Court will not enter judgment in its
favor and against MacGregor with respect to the unjust enrichment
claim at this juncture.  Lincoln General may move for summary
judgment on this point, which we will ultimately decide after the
parties engage in that motion practice.

covering the identical subject matter of the claim, plaintiff cannot pursue a quasi-contractual claim for unjust enrichment."). Thus, the Court need not determine whether Grossbard was an officer of Northern Financial at any time relevant to Lincoln General's unjust enrichment claim.

To the extent that Lincoln General contends that Grossbard is liable for unjust enrichment in his individual capacity or as an officer of MacGregor, such arguments also fail. Grossbard testified that, inter alia, he (1) only works for Insurance World, Inc., not MacGregor, (2) was not paid a commission for any "business that he wrote through MacGregor" or Insurance World, Inc., (3) did not know in 2003 and 2004 whether MacGregor continued to underwrite business for Northern Financial because he does not "get involved in that aspect of the business", and (4) is not aware of whether any of the commissions MacGregor received in connection with the policies issued to the Policyholders were ever refunded to the premium finance company or the insureds because he "do[esn't] know how that operates." (Dkt. entry no. 33-4, Cuomo Decl., Ex. C, 4-20-07 Grossbard Dep., at 27-28, 44, 105.) Lincoln General has not offered any evidence contradicting Grossbard's testimony. Thus, there is no evidence in the present record suggesting that Grossbard, as either an officer of MacGregor or in his individual capacity, received any benefit from Lincoln General. See Royale Luau Resort, LLC, 2008

37

U.S. Dist. LEXIS 11902, at *30 (explaining that to establish an unjust enrichment claim, the plaintiff must show, <u>inter alia</u>, that the defendant received a benefit).  Also, there was no direct relationship between Grossbard and Lincoln General that could have created a reasonable expectation that either would receive a benefit from the other.  <u>See</u> <u>Castro</u>, 851 A.2d at 98-99. Thus, summary judgment is appropriate on Lincoln General's unjust enrichment claim insofar as it is asserted against Grossbard.

**CONCLUSION**

The Court, for the reasons stated supra, will (1) grant AMGRO's motion, (2) grant Grossbard and MacGregor's separate motion with respect to the (a) civil conspiracy count, as it pertains to Grossbard, of the third-party complaint (b) tortious interference with contract count of the third-party complaint and (c) unjust enrichment count, as it pertains to Grossbard, of the third-party complaint, and (3) deny Grossbard and MacGregor's separate motion with respect to the unjust enrichment count, as it pertains to MacGregor, of the third-party complaint.  The Court will issue an appropriate order and judgment.


                                   s/ Mary L. Cooper
                                 **MARY L. COOPER**
                                 United States District Judge

Dated: March 17, 2008